### PROVO RIVER WATER USERS' ASS'N
### v. CARLSON et al.

No. 6444.   Decided February 2, 1943.   (133 P. 2d 777.)

*A. V. Watkins,* of Provo, for appellant.

*L. C. Montgomery,* of Heber City, and *Arthur Woolley,* of Ogden, for respondent.

McDONOUGH, Justice.

The plaintiff Provo River Water Users' Association brought this action to condemn a tract of 18.75 acres of land in Wasatch County. Part of this tract is to be flooded by a reservoir being constructed in Provo canyon, and the remaining part was taken for relocation of a railroad necessitated by flooding an area where the tracks were formerly located. This improvement is connected with the Deer Creek reclamation project.

At the time of trial and for some years prior thereto, the defendant Hyrum B. Carlson was the owner of said tract of 18.75 acres. About 14.4 acres consisted of wild meadow land, and the balance of 4.35 acres was on a hillside covered with sage brush, rocks, and other features characteristic

of land for which irrigation water is not available. The entire tract of 18.75 acres was used by Carlson exclusively as a pasture for his cattle about seven months of the year. The defendant Carlson also owned other real estate, situated in the town of Charleston or adjacent to the town. The pasture tract is about 1½ miles away from the nearest tract of land in Charleston owned by said defendant.

These other properties situated in Charleston consist of the following lands, improvements and facilities: (a) The Carlson home consisting of a ten-room brick house on a lot in the town. (b) Across the street to the east, there is a tract of about 40 acres of irrigated farm land, on which are located a hay barn, a cattle barn equipped and used for milking seven cows at one time, a cooling vat for preparing milk for market, a flowing well with an electric pump, a chicken coop, a pig pen, a store house, granaries, and other improvements and farm facilities. (c) Still farther to the east, and separated from the 40 acre tract by a railroad right of way, a canal, and a road, there is an additional tract of approximately 20 acres of irrigated farm land.

At the time the above mentioned uncultivated 18.75 acre pasture tract was condemned, the defendant Carlson conducted the following farming and dairy activities: On the 40 acre tract he raised sugar beets, certified seed potatoes, peas, grain, and hay, and on the 20 acres to the east of the railroad right-of-way he produced alfalfa hay. He had 25 to 30 head of cattle, 16 to 20 of which were milked each day. The pasture tract of 18.75 acres situated 1½ miles from his farms, was used only during the spring, summer and early fall months. There were no improvements on this pasture tract other than some fences. Carlson fed hay and grain to the cattle during the winter months in Charleston.

Throughout the summer months, after milking the cows in the morning at Charleston, either he or one of his boys drove the cattle from the barn to the pasture, and back again in the evening. This routine of a daily round trip of 3 miles

continued throughout the the spring, summer and early fall months when the pasture was used.

Over the objections of counsel for plaintiff, the defendants Hyrum B. Carlson and wife were permitted to file an amended answer at the time of trial, whereby they not only asked for damages for taking the pasture tract (which was the land described in the complaint), but said defendants also asked for "severance damages" to the properties owned by Carlson 1½ miles from the pasture tract. The theory of defendants was that there was such a unity of use between the properties in Charleston and the pasture tract as a dairy project, that the taking of the pasture by eminent domain proceedings depreciated the lands and improvements owned by Carlson in the town of Charleston. Counsel for defendants contended that the 18.75 acre pasture tract must be treated as a part of the "entire dairy farm" even if the lands are not contiguous. Counsel claimed that all of the Carlson properties were used as a coordinated unit, and must be regarded as one large parcel. Counsel for plaintiff strenuously resisted the contentions of defendants, and claimed that the word "parcel" as used in Section 104-61-11, R. S. U. 1933, means a "tract" of land or land embraced within one boundary without any strip of land owned by a third party intervening.

The trial court held both in rulings on evidence and in the instructions to the jury that if defendants showed "unity of use" and depreciation of the properties situated in Charleston as a result of condemnation of the tract of 18.75 acres, the pasture tract could be considered as being severed from the other lands, to permit the jury to assess severance damages to lands owned by Carlson in the town of Charleston. The jury assessed the market value of the 18.75 acres at $2,605 including accrued interest to date of trial, and awarded "severance damages" in the sum of $1,000 principal and $10 interest, for "damages" to the lands and/improvements in Charleston. Judgment against plaintiff for $3,615 was entered on the verdict. Plaintiff by this appeal

assails the verdict, judgment, and rulings of the trial court by 42 assignments of error.

The alleged errors may be summarized under four general topics: (1) Severance damages, (2) instructions to the jury, (3) competency of witnesses, and (4) conduct of a juror. They will be considered in the order indicated.

Plaintiff and appellant contends the trial court erred in permitting defendants to file the amended answer in which a plea of severance damages was improperly injected into the case, in receiving testimony as to alleged depreciation of properties of Carlson $1\frac{1}{2}$ miles from the tract condemned, and in permitting the jury to assess severance damages to the properties in Charleston. Appellant claims that under our statutes, if an area is not contiguous to the land condemned, such area not condemned cannot be considered a part of the same parcel as the land actually condemned. It is urged that neither severance damages nor damages to the remainder of a parcel, can be awarded unless there is some physical injury resulting to the balance of the tract, a part of which is condemned; and that unless there is some factor connected with the construction or operation of the improvement which injures the land not taken, no damages as to lands not taken can be allowed under our statutes. It is further contended that if a tract is not contiguous to the lands acquired by eminent domain, neither severance damage nor any other indemnity can be assessed for any alleged depreciation of noncontiguous tracts, for the reason the damages are too remote and speculative. The statute in question is Sec. 104-61-11, R. S. U. 1933, the pertinent parts of which provide:

"The court, jury or referee must hear such legal evidence as may be offered by any of the parties to the proceedings, and thereupon must ascertain and assess:

"(1) The value of the property sought to be condemned and all improvements thereon appertaining to the realty, and of each and every separate estate or interest therein; and if it consists of different parcels, the value of each parcel and of each estate or interest therein shall be separately assessed.

"(2) If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff.

"(3) If the property, though no part thereof is taken, will be damaged by the construction of the proposed improvement, the amount of such damages."

In this case there was no contention that the erection of the reservoir and the relocation of the railroad tracks could in any manner injure any of the properties of defendant situated in the town of Charleston. There was no proof offered to show that either the taking of the 18.75 acres for reservoir purposes, or the construction of the reservoir, could possibly result in any physical impairment of the properties in Charleston. Respondent's contention is that the lands and improvements in town were more valuable as a dairy unit when used with this pasture than if used without it. He testified that without this pasture his properties in Charleston, which included 62 acres of irrigated farm lands in the aggregate, devoted to growing various crops and on which are situated his buildings and improvements, would be depreciated $1,000 in value.

All of the cases in this court, which we have been able to find, have predicated both severance damages and damages to lands not taken, on some physical injury to lands not condemned, such as lowering or raising the level of a street or highway so as to impair access, obstruction of light and view, restriction of the remaining area in size or shape so as to render it less valuable for purposes to which it was formerly adapted, or the creation of noise, smoke, or some other condition which would operate to depreciate the market value of the property remaining. *State* v. *District Court,* 94 Utah 384, 78 P. 2d 502; *Bamberger Electric R. Co.* v. *Public Utilities Com.,* 59 Utah 351, 204 P. 314; *Morris* v. *Oregon S. L. R. Co.,* 36 Utah 14, 102 P. 629; *San Pedro, L. A. & S. L. R. Co.* v. *Board of Education,* 32 Utah 305, 90

P. 565, 11 L. R. A., N. S., 645; *Stockdale* v. *Rio Grande Western Ry. Co.,* 28 Utah 201, 77 P. 849; *Dooly Block* v. *Salt Lake Rapid Transit Co.,* 9 Utah 31, 33 P. 229, 24 L. R. A. 610.

In this case, for reasons presently stated, it is not necessary to decide whether or not lands must be contiguous or whether lands must be physically impaired by the construction project, in order to establish a case for severance damages or for damages to lands not condemned but impaired by the improvement. Here, the claim for severance damages in effect is predicated on the theory that the taking of 18.75 acres of pasture lands would make it impossible for defendant Carlson to have a pasture for his cattle. We are of the opinion that the testimony as to depreciation of the Charleston properties of Carlson had no adequate foundation of fact to support it, and the facts admitted by Carlson himself exploded his theory for the reasons hereinafter stated; and for those reasons the facts of this case do not warrant a decision on any theory of severance damages.

First of all, this uncultivated pasture land was not shown to be the only pasture land available within a mile and a half of the Carlson barns. When asked if he knew of any other pasture land which could be bought, Carlson merely stated: "I don't know of any." We need not indulge in some academic discussion as to what would be the rule if all of the available pasture lands and all of the lands adaptable for pasture purposes had been taken by this improvement project or otherwise made unavailable.

Carlson admitted that he had not tried to buy any ground for "the last three or four years." He stated he had looked at some land before it was sold to a man named Price. He gave as one of the reasons he made no attempt to buy other pasture ground, the fact that his boys were away from home engaged in other pursuits, and that he could not manage all of his properties alone.

There was some testimony which was not rebutted, to the effect that "first class" pasture lands were offered for sale in the vicinity of Charleston shortly before the trial at $125 per acre. The record does not show whether such "first class pasture lands" offered for sale in that vicinity were of relatively equal value to the 18.75 acres condemned by plaintiff, nor that they were still available at the time of trial. Whether other land described as "first class" pasture is available has more or less forage per acre, or has as desirable a variety of feed, has sufficient water throughout the pasture season, or would permit more or fewer animals to graze, would be appropriate objects of inquiry in determining market value of the land condemned. If other pasture land approximately the same distance from the Carlson barns could be purchased, would place Carlson in relatively the same position he was in before the 18.75 acre tract was condemned, he would be damaged only to the extent of the cost of acquiring such other pasture. The purchase price of such other pasture would substantially determine the market value of the 18.75 acres.

Furthermore, even if no uncultivated pasture land were available to defendant after his 18.75 acre tract was taken by plaintiff, he still would not be entitled to severance damages if there are in fact other farm lands available for purchase which would produce relatively the same results. Carlson admitted that even some of his own farm lands could be converted into pasture. He testified that he valued his farm lands which were situated only a quarter of a mile from the state highway at only $175 per acre, although they produce the diversified cash crops hereinbefore mentioned, while he valued the 14.4 acres of meadow at $200 per acre by reason of peculiar value to the dairy business, notwithstanding its use was limited entirely to pasture.

Respondent Carlson testified that he valued his hay lands and other farm lands less than the pasture lands because he has to irrigate the farm lands and he did not have to irrigate the 18.75 acre tract. He also stated that the amount of

water available for irrigation of his farm lands is not very certain, whereas he never had to worry about watering the pasture. However, he admitted that additional water rights could be acquired by purchase from the Charleston Irrigation Company to enable him to utilize additional irrigation water on his farm lands. He said there is considerable work involved in irrigation of his farm lands while no work at all to use of the pasture other than driving cattle to and from it each day. However, his testimony does not indicate that he will not be able to have any suitable pasture as a result of condemnation of the tract in question.

There are doubtless certain advantages and disadvantages to cultivated pastures as well as wild pastures. The amount of water available for a tract of land, and the amount and kind of vegetation which can be produced thereon, have a material bearing on value and use. While some work is required in cultivation and irrigation of farm lands used for pastures, it appears that farm lands can be cultivated for pastures within a half mile of the barns where the cows must be milked. These matters all relate to the question of the availability of other lands for pasture uses, and they also relate to market value of the land condemned. The purchase price of a tract of land which produces the same relative results Carlson obtained from the pasture tract prior to condemnation, offsetting the advantages against the disadvantages, would be the controlling factor in the determination of market value of the pasture condemned, whether a greater or a lesser acreage would be required, due consideration being given to type and amount of feed produced, water available, and the location of the land with respect to other properties owned by Carlson. If he could purchase other pasture land or farm land convertible into pasture, within a distance from his barns comparable to that of the condemned tract, and such other land would provide relatively the same kind of forage for the same number of cows or forage of equal ration-value throughout the seven months he used the wild pasture tract,

it could not be contended that his properties in Charleston could be impaired or depreciated by taking the pasture. If another tract of equal forage-producing value and conveniences could be substituted for the tract condemned, whether larger or smaller in area, the defendant would be in relatively the same position he was in before the construction of the reservoir. See *City of St. Louis* v. *St. Louis I. M. & S. R. Co.*, 272 Mo. 80, 197 S. W. 107.

There was considerable opinion testimony received over objections of plaintiff, to the effect that the properties of Carlson situated in Charleston had a greater market value as a dairy and farming unit by using the pasture in connection with these properties than without such pasture. Such was the method of claiming "severance damages." There were several fatal objections to such opinion testimony. First, the opinion testimony was based on the premise not established by evidence, that there were no other pasture lands available within the same distance and no farm land which could be converted into pasture to provide the necessary forage for cattle during the summer. Second, if another tract of equal value and productivity as a pasture were obtained to replace the pasture taken by plaintiff, the combined value of all of Carlson's properties when used in connection with a pasture, would be wholly immaterial and irrelevant. Third, the testimony of Carlson appears to have destroyed any possible foundation for any such opinion testimony. He definitely stated on cross-examination that no one offered to buy all of his properties as one "operating unit." The offers he did receive failed to indicate that anyone was interested in buying the distant pasture along with the Charleston properties or vice versa. Someone had tried to buy the pasture who was not interested in the Charleston properties. On another occasion a man wanted to buy all of the properties in Charleston from defendant but he did not want the pasture, as he already owned some pasture ground. It does not appear that anyone ever

sought to buy all of the properties as one "unified dairy farm."

The facts of this case indicate there was no premise for the application of any rules for severance damage and no basis for awarding damages to lands not taken but injured by the improvement project. It is necessary to set aside the verdict and the judgment on the verdict and to grant a new trial, to make a proper determination of the market value of the 18.75 acres. The instructions to the jury were erroneous with respect to the unwarranted issue of severance damages.

Appellant complains about the qualifications of certain witnesses called to testify on behalf of defendants, and also as to the competency of testimony of defense witnesses. As to the qualifications of defendant Carlson, there is no merit to the contention that he was not competent to give an opinion as to value of his property. An owner of property is always entitled to testify as to its value, and to express an opinion as to its value in condemnation proceedings. An owner does not have to qualify as an expert, nor be engaged in buying and selling real estate. We do not believe the trial court erred in permitting certain farmers and a machinery salesman to testify as to the value of the pasture. They were familiar with land sales in the neighborhood, and the use and productivity of the land. The fact they were not trained real estate salesmen would not disqualify them. Witnesses who are familiar with the character of land near their own lands, acquainted with the conditions of moisture, type of soil, depth of soil, and other physical factors, frequently have a better idea of land values in the neighborhood than strangers who may be real estate salesmen but who have no detailed knowledge of the characteristics of the land. The limited experiences of the witnesses might tend to depreciate the weight of their testimony, but it would not make them incompetent to testify if they were acquainted with land values. *Salt Lake & U. R. Co.* v. *Schramm,* 56 Utah 53, 58, 189 P. 90; 32 C.

J. S., Evidence, § 745, p. 305. In this case we cannot say there was not substantial evidence as to market value offered by defendant, nor that the testimony as to value of the pasture was incompetent.

During the trial counsel for plaintiff requested the court to declare a mistrial for the reason one of the jurors happened to engage in conversation with one of the witnesses for plaintiff prior to opening of court one morning during the trial. The witness did not know at the time that the man was a juror. It was claimed that the juror declared in an argumentative manner that pasture lands in Wasatch county were worth $200 per acre. It was urged by plaintiff's counsel that the juror had a fixed and unalterable opinion on the issue of market value, and that there was no merit in proceeding any further with the trial as far as this particular juror was concerned.

The purpose of a trial of the issues is to have the facts determined impartially and fairly by a court or jury. Jurors as well as judges must base their verdicts or decisions on the evidence presented during the trial, not on the basis of some independent personal investigation or determination of the facts outside of court. *Hoeft* v. *State et al.*, 221 Iowa 694, 266 N. W. 571, 104 A. L. R. 1008.

In view of the fact the case must be remanded for a new trial, we suggest that the court and counsel on the retrial of the case make appropriate inquiry in the examination of prospective jurors to ascertain if any of the veniremen called for duty have any fixed opinions or preconceived ideas as to what the defendant should receive for the 18.75 acres of land taken by eminent domain. This does not mean that a man who knows anything about land values in the county is disqualified to serve as a juror. We do not find it necessary to decide whether or not the request for mistrial should have been granted. We believe that if the jurors are properly interrogated, in the event any one has a fixed opinion which would preclude him from

considering the evidence fairly, such fact will likely be disclosed.

The order denying plaintiff's motion for a new trial is vacated and set aside, and the cause is remanded to the district court with directions to set aside the verdict and the judgment on the verdict, and to grant a new trial in accordance with the views herein expressed.

Costs to appellant.

WOLFE, C. J., and M. J. BRONSON, District Judge, concur.

MOFFAT, J., concurs in the result.

LARSON, Justice (dissenting).

I dissent.

The right of eminent domain exists only upon the condition that full payment be made to the owner of the property taken for all damages he sustains by or as a result of the taking of the property. This contemplates not only payment for the property actually taken for use of the condemnor but for damages resulting to the condemnee by the loss of the property so taken. Normally we say the condemnee is entitled to recover the value of the land actually taken, plus the damages to the land not taken. This expression too often leads to misapplication of the true rule of recovery of damages. We should think of it in terms of property, not in terms of land. The condemnee is entitled to recover the full value of the loss he sustains by the infringement of and interference with his legal rights—the right to use his physical holdings in any legitimate way or business he may choose. The old rule was inclined to be rigid and confine the damages recoverable to the particular tract of land from which the taken part was severed. It was then extended to permit consideration of damages, if any, to contiguous tracts. Later the vision of the law became clearer. Instead of seeing through a glass darkly, the courts realized that damage to

property rights were not always identical with damage to land as such, and the rule of unity of use was recognized and applied. This is sometimes spoken of as unity of property. If various tracts of land not contiguous are owned by the condemnee, and are so used and operated that the uses to which the owner is putting the tracts none of which is taken, is substantially interfered with, that constitutes a damage due to the taking which is cognizable in the action. The rule is thus laid down in 29 C. J. S., Eminent Domain, § 140, page 982:

"To constitute a unity of property within the rule, there must be such a connection or relation of adaptation, convenience, and actual and permanent use as to make the enjoyment of the parcel taken reasonably and substantially necessary to the enjoyment of the parcels left, in the most advantageous and profitable manner in the business for which they are used.  *  *  *  The separate parcels may be considered as one if they are so inseparably connected in the use to which they are applied that injury or destruction of one must necessarily and permanently affect the other."

So too are the decisions of the courts of which we note only a few of the many we have examined.

"Where a parcel of land used as a part of an entire property is sought to be taken for public use, and the land sought to be taken is of greater value, considered as a part of the entire property, than if taken as a distinct and separate piece entirely disconnected from the residue, the just compensation for the part so taken is its fair cash or market value when considered in its relation to and as a part of the entire property, and not simply what may appear to be its value as a separate and distinct piece." *City of Chicago* v. *Cruse*, 337 Ill. 537, 169 N. E. 322, 323. See also in 20 C. J., page 736, note 63; 29 C. J. S., Eminent Domain, § 140 note 16.

If several tracts are used together as a farm, in determining the compensation to be paid the owner on condemnation of only part of the land, the tract constitutes a unity and the injury to the whole farm should be considered. *Grand River Dam Authority* v. *Thompson*, 10 Cir., 118 F. 2d 242. See also *U. S. ex rel. T. V. A.* v. *Powelson*, 4 Cir.,

118 F. 2d 79, 87, modifying *U. S. ex rel. T. V. A.* v. *Southern St. Power Co.,* D. C., 33 F. Supp. 519; *U. S.* v. *Crary,* D. C., 2 F. Supp. 870; *City of Stockton* v. *Marengo,* 137 Cal. App. 760, 31 P. 2d 467, 470; *State* v. *Hoblitt,* 87 Mont. 403, 288 P. 181; *Dean* v. *County Bd. of Education,* 210 Ala. 256, 97 So. 741; *Duggan* v. *State,* 214 Iowa 230, 242 N. W. 98; *City of Middleboro* v. *Chasteen,* 285 Ky. 427, 148 S. W. 2d 295; *Darlington* v. *Pennsylvania R. Co.,* 278 Pa. 307, 123 A. 284; *Atchison T. & S. F. R. Co.* v. *Southern Pac. Co.,* 13 Cal. App. 2d 505, 57 P. 2d 575; *City of Stockton* v. *Ellingwood,* 96 Cal. App. 708, 275 P. 228; 20 C. J., p. 737, note 66; 29 C. J. S., Eminent Domain, § 140 note 19; *Texas Empire Pipe Line* v. *Stewart,* 331 Mo. 525, 55 S. W. 2d 283, reversing *Id.,* Mo. App., 35 S. W. 2d 627; *City of St. Louis* v. *St. Louis I. M. & S. R. Co.,* 272 Mo. 80, 197 S. W. 107.

There is evidence showing that Carlson used all his lands as a farm unit; that an essential or important part of his farming enterprise was his dairy business; that such dairy business could not well be operated without the pasture lands or other pastures of substantially equal values in usage; that the taking of these pasture lands substantially destroyed or injured Carlson's farming enterprise. The whole thing as a farm unit kept a family profitably employed; but it may well be that minus the pasture, and therefore minus the efficient operation of the dairy business, the balance of the farm would not well keep a family; could not be successfully and financially operated as a farm undertaking to efficiently maintain a family unit, and therefore its value might be materially lessened. I think that presents a question for the jury. The trial court so viewed it, and I think correctly submitted it.

The prevailing opinion assumes the burden was on Carlson to show he could not retrieve his losses by the purchase of other lands. It is elemental that the condemnor has the burden of showing offsets or other facts which might lessen the damages directly resulting to the condemnee from the interference with his property rights. Again the prevailing

opinion assumes that Carlson could convert some of his other farm lands into pasturage. Two objections to that reasoning present themselves: That might decrease the farm unit to a size where it would not be a feasible paying farm unit, and reasonably maintain a family; and, secondly, such burden of proof should be on the condemnor not the property owner. So I think the matter was properly submitted to the jury, and there is sufficient evidence to uphold its verdict.

PRATT, J., on leave of absence.